# United States District Court
## for the Northern District of Oklahoma

Case No. 25-cr-128-JDR

United States,

*Plaintiff*,

*versus*

Kedrick Shane Marshall,

*Defendant*.

## OPINION AND ORDER

    Defendant Kedrick Shane Marshall was the sole passenger in a car stopped by Sapulpa Police Officer Hayden Vernon for a traffic violation shortly after midnight on February 6, 2024. The driver, Roxanne Willson, had allegedly failed to maintain her lane. Ms. Willson gave Officer Vernon consent to search her car. Before conducting that search, Officer Vernon frisked Mr. Marshall when he got out of the car and found a gun in the rear pocket of his pants. Knowing that Mr. Marshall was a convicted felon, Officer Vernon arrested him for possessing a firearm after a former conviction of a felony. The grand jury returned an indictment charging Mr. Marshall with a single count of possessing a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Dkt. 2. Mr. Marshall moved to suppress the warrantless frisk, and the Government opposed. Dkts. 18, 21. The Court held an evidentiary hearing [Dkt. 22], and for the reasons set forth below, Mr. Marshall's motion to suppress is denied.

No. 25-cr-128

I

Shortly after midnight on February 6, 2024, Officer Vernon followed Ms. Willson's car as she drove around Sapulpa.[1] After failing to maintain her lane, Officer Vernon stopped Ms. Willson in front of the house where she was staying. Mr. Marshall was a front-seat passenger in Ms. Willson's car. As Officer Vernon approached the passenger side of the car, Mr. Marshall rolled down the window so that they could speak. Officer Vernon asserts that he detected a "vinegar-like" odor emanating from the car, which he associated with body odor from use of opiates. Officer Vernon obtained Ms. Willson's driver's license, but he was not able to obtain any identification documents from Mr. Marshall because he stated that his wallet had been stolen. Mr. Marshall told him that his only identification was an Oklahoma Department of Corrections ID.

Officer Vernon conferred with another officer, Captain James Lowry, who had arrived at the scene, telling him about the vinegar smell he noticed after Mr. Marshall rolled down the passenger window. Officer Vernon next asked Ms. Willson to accompany him to his patrol car to complete the traffic stop. While performing the check of Ms. Willson's license, Officer Vernon asked Ms. Willson a series of questions and discussed a prior arrest of her in which he had been involved. Mr. Marshall remained in the car. After completing his check of the records, Ms. Willson gave consent to search the car. She asked Officer Vernon to remove Mr. Marshall from the car before searching it.

At the motion hearing, Officer Vernon testified that he had interacted with Mr. Marshall before and knew he was associated with the Universal Arian Brotherhood gang, which is known for its involvement in narcotics, firearms, and violent crimes. Officer Vernon opened the passenger door and asked Mr. Marshall to get out of the car, which he did. Officer Vernon asked

---

[1] These facts are based on footage from Officer Vernon's body camera. Dkt. 19.

him to turn around and put his hands on the roof of the car to be frisked. During the frisk, Officer Vernon found the gun in Mr. Marshall's rear pocket. Knowing Mr. Marshall was a convicted felon, Officer Vernon placed Mr. Marshall under arrest.

## II

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Stopping a car constitutes a "seizure" both of the driver and his or her passengers. *Brendlin v. California*, 551 U.S. 249, 255-59 (2007). When evaluating the reasonableness of a traffic stop, courts engage in a two-part inquiry—asking, first, whether the stop was "justified at its inception," and second, whether the officers' actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968); *United States v. Madrid*, 713 F.3d 1251, 1255-56 (10th Cir. 2013).

A lawful traffic stop must be justified at its inception and be reasonable in scope and duration. *United States v. Lang*, 81 F.3d 955, 966 (10th Cir. 1996). The allowable duration of a traffic stop is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). Tasks and inquiries unrelated to the mission of the stop violate the Fourth Amendment unless (i) they're performed simultaneous with other mission-related tasks and do not measurably extend the duration of the stop, or (ii) the officer has reasonable articulable suspicion that other criminal activity is afoot. *See id.* at 354-55. "[A] stop is unlawfully prolonged when an officer, without reasonable suspicion, diverts from the stop's purpose and adds time to the stop in order to investigate other crimes." *United States v. Campbell*, 26 F.4th 860, 884 (11th Cir. 2022) (citing *Rodriguez*, 575 U.S. at 353-57; *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018)).

No. 25-cr-128

In *Pennsylvania v. Mimms*, the Supreme Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." 434 U.S. 106, 111 n.6 (1977). The Court reasoned that the government's "'legitimate and weighty' interest in officer safety ... outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle." *Arizona v. Johnson*, 555 U.S. 323, 331 (2009) (quoting *Mimms*, 434 U.S. at 110-11). Relying on the rule established in *Terry v. Ohio*, the Court held that "a driver, once outside the stopped vehicle, may be patted down for weapons if the officer reasonably concludes that the driver 'might be armed and presently dangerous.'" *Id.* (quoting *Mimms*, 434 U.S. at 112).

Then, in *Maryland v. Wilson*, the Supreme Court held that because "the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger[,] ... an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." 519 U.S. 408, 413, 415 (1997). The Court reasoned that, although "the driver has committed a minor vehicular offense," a passenger has the same motivation "to employ violence to prevent apprehension" of a more serious crime and "the additional intrusion on the passenger is minimal." *Id.* at 413-15. Thus, the same parameters involving the frisk of a driver apply to the passenger. *Johnson*, 555 U.S. at 327 ("To justify a patdown of the driver or a passenger during a traffic stop ... the police must harbor reasonable suspicion that the person subjected to the frisk is armed and dangerous.").

Mr. Marshall does not dispute the validity of the initial traffic stop or Ms. Willson's consent to search the car. Instead, he argues that Officer Vernon unlawfully extended the duration of the stop beyond what was reasonably required and that the frisk of his person was conducted without reasonable and articulable suspicion that he was armed and dangerous. Dkt. 18 at 4-7. The Government responds that Officer Vernon did not exceed the

4

scope of his initial traffic stop when Ms. Willson consented to the search, but even if Officer Vernon exceeded the scope of the stop, he had reasonable suspicion of ongoing criminal activity based on the "vinegar-like" odor coming from the car and Ms. Willson's nervous demeanor. Dkt. 21 at 3-5. Further, the Government argues that Officer Vernon's frisk of Mr. Marshall was constitutional because he had reasonable suspicion that Mr. Marshall was armed and dangerous based on the "vinegar-like" smell, Ms. Willson's nervous demeanor, concerns for Officer Vernon's safety as he conducted the search of the car, Officer Vernon's knowledge of Mr. Marshall's criminal history and affiliation with a gang, and that the encounter took place in the middle of the night. *Id.* at 7-10.

Here, Officer Vernon lawfully pulled Ms. Willson over for failing to maintain her lane. During this seizure, Officer Vernon permissibly asked Ms. Willson to step out of the car and sit in his squad car while he ran a computer check. *See United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994) (holding that an officer may request documents, run a computer check, and issue a citation before releasing the detainee) (overruled on other grounds); *see also United States v. Vargas*, 57 F. App'x 394, 398 (10th Cir. 2003) (holding that officer's decision to direct driver to sit in the front seat of the squad car was reasonable). This was all conducted within the scope of Officer Vernon's initial traffic stop.

Once Officer Vernon satisfied his initial reasonable suspicions related to the traffic violation, he was required to release Ms. Willson unless he "obtain[ed] 'a new and independent basis' for suspecting" criminal activity or obtained consent to prolong the detention. *United States v. Winder*, 557 F.3d 1129, 1135 (10th Cir. 2009) (quoting *United States v. Peters*, 10 F.3d 1517, 1522 (10th Cir. 1993)). Officer Vernon did both. Although a nervous demeanor "is of limited significance in determining reasonable suspicion[,]"[2] an officer's

---

[2] *United States v. Fernandez*, 18 F.3d 874, 879 (10th Cir. 1994).

belief that he smells drugs in the car "is entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause." *United States v. West*, 219 F.3d 1171, 1178 (10th Cir. 2000) (collecting cases). Further, "knowledge of a person's prior criminal involvement is not sufficient itself to ... rise to the level of reasonable suspicion, [but] it can combine with other factors to support the requisite standard of suspicion." *Id.* at 1179 (citing *United States v. Sandoval*, 29 F.3d 537, 542 (10th Cir. 1994); *United States v. McCranie*, 703 F.2d 1213, 1218 (10th Cir. 1983)). Based on the "vinegar-like" odor coming from the car, which Officer Vernon believed to be consistent with opiate use based on his training and prior experience, Officer Vernon's knowledge of Ms. Willson's prior criminal history, and Ms. Willson's nervous demeanor, Officer Vernon had an independent basis for suspecting criminal activity. Officer Vernon then asked Ms. Willson for her consent to search the vehicle, which she provided. Thus, Officer Vernon had both a reasonable suspicion of criminal activity and consent to extend the duration of the stop.

Based on Ms. Willson's consent to search the car, Officer Vernon had the authority to ask Mr. Marshall to exit the car to conduct the search. *Wilson*, 519 U.S. at 414-15. The question before the Court is whether Officer Vernon had the requisite reasonable suspicion that Mr. Marshall was armed and presently dangerous to conduct the frisk once Mr. Marshall stepped out of the car. The purpose of this type of frisk "is not to discover evidence of a crime, 'but to allow the officer to pursue his investigation without fear of violence.'" *United States v. Manjarrez*, 348 F.3d 881, 886-87 (10th Cir. 2003) (quoting *Adams v. Williams*, 407 U.S. 143, 146 (1972)). To determine whether an officer has reasonable suspicion to conduct a frisk, the Court looks to the totality of the circumstances surrounding the interaction. *United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011). "'This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might

No. 25-cr-128

well elude an untrained person.'" *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

The same considerations which gave Officer Vernon reasonable suspicion to extend the traffic stop to search Ms. Marshall's car also factor into the circumstances surrounding whether Officer Vernon had reasonable suspicion to believe that Mr. Marshall was armed and dangerous. Officer Vernon testified that Ms. Willson's request to remove Mr. Marshall from the car before conducting the search led him to believe that Mr. Marshall might be armed. Further, Officer Vernon knew that Mr. Marshall was a convicted felon and was affiliated with a gang known for violent behavior. Officer Vernon was also faced with concerns for his own safety: Although there was another officer on the scene, Officer Vernon knew both detainees had a prior criminal history and that he would be required to turn his back on them to conduct the search in the middle of the night. *See, e.g., Johnson*, 555 U.S. at 334 (holding that the officer "was not constitutionally required to give [the passenger] an opportunity to depart the scene after he exited the vehicle without first ensuring that, in doing, so, she was not permitting a dangerous person to get behind her"). Based on the totality of the circumstances, Officer Vernon had reasonable suspicion that Mr. Marshall was armed and dangerous and that the frisk was necessary. Mr. Marshall's motion to suppress [Dkt. 18] is denied.

SO ORDERED.

DATED this 29th day of May 2025.

_____
JOHN D. RUSSELL
*United States District Judge*